**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  07-20227-CIV-MORENO/SIMONTON**

**DAVID A. TEJERA,**

               **Petitioner,**

**v.**

**BILL MCCOLLUM, Attorney**
**General of the State of Florida,**

               **Respondent.**
**_____/**

**REPORT AND RECOMMENDATION**

   Presently pending before the Court is the Petition under 28 U.S.C. § 2254 for writ of Habeas Corpus by a person in state custody, filed by Petitioner David A. Tejera, through counsel, attacking his conviction in state court (DE ## 1, 2).  This Petition is referred to the undersigned Magistrate Judge for a report and recommendation (DE # 3).  Respondent has filed a response to this Court's order to show cause (DE # 10).  Petitioner, pro se, then filed a reply (DE # 29).  For the reasons stated below, it is recommended that the petition be denied.

   Petitioner seeks to overturn the jury verdict finding him guilty of second-degree murder in Florida State Court, which Florida's Third District Court of Appeal affirmed.  His request for relief is based upon his claim that he did not receive a fundamentally fair trial because of the prosecutor's misconduct at trial, which violated his rights under the Fifth and Fourteenth Amendments.  In sum, Petitioner contends that the prosecutor inflamed the jury through her improper actions, by: 1) interjecting into the trial the issue of whether Petitioner had sexually assaulted his victim, Jennifer Nelson, before strangling her; 2) stating in her opening statement that Petitioner had dined in fancy

restaurants after killing Nelson; 3) introducing into evidence multiple photographs of Nelson's naked corpse; 4) repeatedly referring to the rape kit performed on Nelson; 5) providing the jury with a transcript of Petitioner's tape-recorded statements that misstated an important portion of Petitioner's statement, and 6) misstating the evidence and expressing her personal beliefs in closing argument.

For the reasons set forth below, the undersigned concludes that the determinations of the state court that the prosecutor: 1) did not interject into the trial the issue of whether Petitioner had sexually assaulted Nelson, before strangling her; 2) did not misstate the evidence or commit misconduct contending that Petitioner had dined in fancy restaurants after killing Nelson; 3) properly introduced into evidence multiple photographs of Nelson's naked corpse; 4) properly referred to the rape kit performed on Nelson; 5) did not commit misconduct by providing with the jury an erroneous transcript of Petitioner's tape-recorded statements, and 6) did not misstate the evidence and did not improperly express her personal beliefs in closing argument, are not contrary to, or an unreasonable application of, federal constitutional law as set forth by the United States Supreme Court.  Therefore, Petitioner is not entitled to relief.

## I.  Background

### A.  Petitioner's Trial

On November 12, 2003, a one-count information was filed in Florida state court charging Petitioner, on or about September 30, 2003, with the second degree murder of Jennifer Nelson by choking and strangling (R. 7-9).[1]  On October 22, 2004, after a jury

---

[1] The record of Petitioner's trial appears at Ex. H to DE # 14, and will be referred to as "R", followed by a page number.

trial, Petitioner was convicted of second-degree murder (R. 151-52; Tr. 562-63, 565, 583).[2] Petitioner was subsequently sentenced to life imprisonment (R. 160; Tr. 583-84).

### 1. Voir Dire

During voir dire, the prosecutor asked prospective jurors whether they would be able to give the life of Nelson, a prostitute, the same value as that of any other individual (Tr. 90-108).   During this, the prosecutor went on to ask the prospective jurors whether they thought a prostitute could be raped or a victim of battery (Tr. 90-93).

After the jury was chosen, the court gave initial instructions, which included an instruction that what the lawyers say is not evidence and the jury was not to consider it as such (Tr. 201).

After voir dire concluded, and before the opening statements, defense counsel moved to prevent the prosecutor from any mention in either her opening statement and during the state's case-in-chief of any evidence relating to sexual battery or rape, noting that the information contained no allegation of sexual battery (Tr. 213-14).  The Court then asked the prosecutor if she intended to make reference to a sexual battery during her opening statement, and the prosecutor said she did not (Tr. 214).

### 2. The Opening Statements

During the prosecutor's opening statement, the prosecutor did not mention rape or sexual battery (Tr. 216-22).  The prosecutor outlined her theory of how Nelson's death occurred.  Specifically, she stated that the evidence would show that Petitioner had to keep strangling Nelson for minutes after she lost consciousness, which is why he was charged with second degree murder (Tr. 218-19).  The prosecutor also stated that the

---

[2] The trial transcript appears in the record at DE # 15 and will be referred to as "Tr." followed by a page number.

evidence would show that after Petitioner killed Nelson, the police had him under surveillance, and saw him having a great time, dining at fancy restaurants in Miami Beach with a friend (Tr. 221).  In Petitioner's opening statement, Petitioner's counsel conceded that Petitioner had strangled and killed Nelson after he had paid her for consensual sex, but that he strangled her as a reaction after Nelson kicked him in the testicles, and that these facts supported a manslaughter conviction, not a murder conviction (Tr. 223-29).

### 3.  The State's Case

The events upon which Petitioner's convictions were based took place during September 29 and 30, 2003.  At trial, the State's evidence established the following: prosecution witness Al Montenegro testified that on the evening of September 29, 2003, he was living in his car (Tr. 236).  At approximately 2:30 a.m. on the morning of September 30, 2003, Montenegro returned to his car which was parked in front of 1616 Michigan Avenue, Miami Beach (Tr. 237).  Around 3:00 a.m., Montenegro saw a heavy set man leave the building located at 1616 Michigan and walk toward Lincoln Road (Tr. 240-42).  Ten to fifteen minutes later, the same man returned, double-parked a light grey or silver car with the blinkers on next to Montenegro's car, and reentered 1616 Michigan Avenue (Tr. 242-43).  At about 3:00 a.m., the same man left the building dragging a woman, who was lying on her back and did not have on any shoes (Tr. 243-45, 251). Montenegro saw this man put the woman into the front seat of a car and drive off. Montenegro stated that the man just looked like he did not care about the woman but was just trying to hide her (Tr. 247, 251).  Montenegro reported what he had seen to Miami Beach Police Officer Yomaca, who was working an off-duty job nearby (Tr. 248, 256-57).  Montenegro then fell asleep in his car (Tr. 248-49).  Officer Yomaca went to see

if he could uncover anything unusual.  When he did not, his involvement ceased (Tr. 257).

In the early morning hours of September 30, 2003, Miami Beach Firefighter Brenton Byrne responded to a 911 call about a water leak at 1616 Michigan Avenue, which call had been made by the inhabitant of Apartment 1 (Tr. 258-60).  His investigation led him to Apartment 4 (Tr. 260-61).  After Byrne knocked on Apartment 4's door for five or ten minutes, Petitioner answered the door and said that he had been sleeping (Tr. 261).  Byrne had the impression that Petitioner was not telling the truth and was faking his yawn (Tr. 261-62).  Byrne then entered Petitioner's bathroom, and noticed that the floor had been freshly mopped, and that the sink was three quarters full of water and also had dark clothes in it (Tr. 262-64, 266).

Montenegro was awakened at approximately 5:00 a.m. by the fire truck investigating a water leak at 1616 Michigan Avenue.  At that time, Montenegro reported what he had seen to Firefighter Byrne (Tr. 248-49, 265-66).

At approximately 5:15 a.m. on the morning of September 30, 2003, Stephen Kelly, a dietician at Jackson Memorial Hospital, discovered Jennifer Nelson's body, naked from the waist up, alongside a curb at a bus stop at near Jackson Memorial Hospital, and Kelly notified security at Jackson Memorial Hospital (Tr. 267-69).  Nelson was a little dirty and a little purple (Tr. 269).  Over a relevancy objection, the prosecution introduced a picture of Nelson's naked body lying in the street (Tr. 270-73, State Exhibit 10).

City of Miami Paramedic Alfredo Agres was called to the scene and confirmed that Nelson was deceased, as rigor mortis had already set in (Tr. 275-77, 279-80).  Nelson was lying in the gutter and had black clothing or a shirt on, and Agres cut off Nelson's clothing to put "fast patches" on, to try and start Nelson's heart and also to check if

Nelson's heart was beating (Tr. 276-78, 279).  Again over a relevancy objection, the prosecution introduced a second picture of Nelson's naked body lying in the street, with the fast patches attached (Tr. 278-79; State Exhibit 11).  Agres did not see shoes or a purse near the body (Tr. 280).

City of Miami Crime Scene Investigator Willard Delancey processed the scene near Jackson Memorial Hospital after 7:00 a.m. (Tr. 281-82, 285).  He collected Nelson's clothing and processed her body for fingerprints (Tr. 284-85, 287-91, 295-97).  He did not find any fingerprints (Tr. 295).[3]  Again over a relevancy objection, the prosecution introduced a third picture of Nelson's naked body lying in the street, detailing the fingerprinting process (Tr. 291-97, State Exhibit 18).  Next, Delancey took scrapings from Nelson's fingernails (Tr. 298-302).  Delancey also testified that a rape kit examination was performed on Nelson.  Delancey stated that taking a rape kit, did not mean there was any proof of rape, but was meant to find evidence of sexual intercourse (Tr. 302, 305-06).  City of Miami Detective Orlando Silva subsequently agreed that the purpose of conducting the rape kit examination is to determine if a person has had sex (Sr. 67).[4]

Detective Silva testified that Nelson's body was found at 5:25 a.m. on September 30, 2003 and that at about 7:30 a.m., he responded to the crime scene, located at NW 8th Avenue and 17th Street, near Jackson Memorial Hospital (Sr. 4-6).  Fire rescue had already pronounced Nelson dead.  Nelson was naked from the waist down and she did

---

[3] On October 22, 2003, Investigator Delancey processed Petitioner's apartment and car for evidence, pursuant to a search warrant, and found nothing of evidentiary value (Tr. 303-04).  The search did not find Nelson's purse or cell phone (Sr. 92-93).

[4] The transcript of the trial testimony taken on the afternoon of October 22, 2004 appears in the record at Ex. I to DE # 14, and will be referred to as "Sr.", followed by a page number.

not have any shoes or handbag on her (Sr. 6).  Silva stated that the medical examiner was present and performed a rape kit on Nelson (Tr. 7).  Silva further testified that the area around the hospital, like many in Miami, is a high crime area (Sr. 90-91).  Silva had been a Miami policeman for twenty-one years, and that he had never heard of a case where somebody had robbed high heeled shoes from a corpse (Sr. 95).

After the scene was processed and Nelson's identity was ascertained, Silva spoke to Crystal Cross, a friend of Nelson's (Sr. 11).  Cross had seen Nelson entering a car on the night of September 29, 2003 (Sr. 7-15).  From Cross' description, Silva prepared a composite sketch of the individual whose car Nelson had entered on the night of September 29, 2003 (Sr. 12-13).  Silva also spoke to Nelson's father, who assisted the investigation by going to the media and asking if anyone had any information about the murder of his daughter (Sr. 14).

The Miami Herald then published an article about the case.  On October 4, 2003, after the article appeared in the Herald, Detective Silva received a telephone call from Montenegro, who had read the article, and Montenegro told Silva what he had seen a few days earlier.  Afterwards, Montenegro took Silva to 1616 Michigan Avenue, Miami Beach (Sr. 14-16; Tr. 249-51).  Montenegro drew for the Miami police a diagram of the scene at 1616 Michigan Avenue that showed where he had been parked.  Montenegro also drew a sketch of the heavy set individual whom he had seen dragging the body from the building (Sr. 15-16; Tr. 252-55).  Detective Silva obtained drivers license photographs of the residents of the eighteen apartments at 1616 Michigan Avenue, and based on the description of the suspect, the investigation focused on Petitioner (Sr. 19-20).

Detective Silva then initiated surveillance of Petitioner to try and obtain a DNA sample from Petitioner (Sr. 18-19).  On the first day of the surveillance, October 16, 2004,

Officer Marcus Perez saw Petitioner enter the News Café on Miami Beach with a white female (Tr. 319). On the second day of the surveillance, October 17, 2004, Petitioner threw a cigarette butt from his automobile, which was retrieved by Officer Perez (Tr. 317-24; Sr. 22). The DNA on the cigarette butt matched Petitioner's DNA, as well as the DNA which had been taken from Nelson's corpse (Sr. 21-23, 101, 104; Tr. 20, 95). On October 18, 2004, the third day of the surveillance, Officer Perez saw Petitioner eat breakfast with a white female at a restaurant on Lincoln Road (Tr. 326).

On the morning of October 22, 2003, Detective Silva arrested Petitioner, pursuant to a warrant (Sr. 23). After being advised of his rights and waiving them, Petitioner made a statement (Sr. 23-27). In the pre-interview, Petitioner denied having any involvement in Nelson's homicide, but admitted to picking Nelson up, having sex with her, and then dropping her off a block away from his apartment (Sr. 27-28). Then, after being confronted with the DNA evidence and the eyewitness testimony, Petitioner gave two tape-recorded statements to Silva (Sr. 28). In the first statement, (Sr. 34-58), Petitioner told Silva that he had picked up Nelson, a prostitute, on Collins Avenue, on his way home to his apartment at 1616 Michigan Avenue (Sr. 36-37). He also stated that Nelson had a friend with her (Sr. 37).[5] Petitioner further stated that at his apartment, he and Nelson had engaged in consensual oral, anal and vaginal sex, for about forty-five minutes (Sr. 39-40). After they were finished, Nelson went into the bathroom and Petitioner asked Nelson to stay for more money, and she said she would think about it. When Nelson returned from the bathroom, she stated that she wanted to go (Sr. 40). As Petitioner was walking her to the door, he grabbed Nelson's hand, not in a rough way,

---

[5] Detective Silva was not aware of any evidence that Petitioner had known Nelson before the evening of September 29, 2003 (Sr. 73-74).

and again asked her to stay, and she "flipped" and kicked him very hard between his legs (Tr. 40-41).  Petitioner further stated that as he dropped down to the floor, Nelson punched him in his face and the side of his head.  When she came toward him again, he grabbed her and pulled her down because he couldn't get up due to the pain, and she continued to hit him, saying she just wanted to go.  Petitioner said he would take her, if she would stop hitting him (Sr. 41).  Nelson continued to hit Petitioner, who grabbed her by the neck with his right hand and she passed out, and while her heart was beating, it was not normal, but "very soft" (Sr. 41-42, 46-47, 55-56).  Petitioner told Silva that he "freaked out", and that he tried to revive Nelson with a wet towel for five or ten minutes (Sr. 42-43, 47).  Petitioner stated that he wanted to call 911, but thought he would get in trouble (Sr. 43). When Nelson did not respond, Petitioner, thinking she was still alive, put her in his car, intending to drive her to the emergency room at Jackson Memorial Hospital and claim that he barely knew her and that she had passed out.  Petitioner then remembered that he might have left a mark on Nelson's neck (Sr. 43-44).

Petitioner left Nelson sitting on a flower ledge while he went to get his car.  After Petitioner got his car, he came back, picked Nelson up and put her in the car (Sr. 44, 49-50).  When Petitioner neared Jackson Memorial Hospital, he kept trying to wake her up, and then checked her pulse and it wasn't beating the right way (Sr. 45).  He got scared and decided to leave Nelson on the street near the emergency room, where he thought she would be found (Sr. 44-46, 47-48).  He said that when he laid her down, face up, she made a noise (Sr. 45-46, 50, 52).  Petitioner stated that he left Nelson there with her shoes and her purse (Sr. 48-49).  He then returned home (Sr. 53).  Petitioner denied making the marks on Nelson's wrists (Sr. 53).

Petitioner initiated the second interview later on the same day, about forty-five

minutes after the conclusion of the first interview, to add something that he left out (Sr. 58).  Petitioner stated that when Nelson slipped from his grasp when he was trying to take her to the car, he had grabbed her wrists (Sr. 59).  Petitioner also said that during sex, Nelson wanted to do "freaky stuff", and she had asked him to tie her wrists together, so he used painting blue tape to bind her wrists and took the tape off her after they finished having sex (Sr. 59, 60-62, 64).

Miami-Dade County Medical Examiner Dr. Eric Mont supervised Nelson's autopsy on September 30, 2003 (Tr. 327, 331).  Dr. Mont testified that the cause of Nelson's death was strangulation, which would have had to last for three to five minutes (Tr. 333, 376-383, 424, 426).  The fatal period for strangulation could have been shorter by a matter of seconds because immediately prior to being strangled, Nelson had used cocaine and had engaged in sex, both of which could have affected the normal flow of oxygen to her brain (Tr. 397-402, 423-24).

Nelson was five feet eight inches tall and weighed 142 pounds, and appeared to have been healthy (Tr. 337-38).  Dr. Mont described the external injuries to Nelson in detail.  Nelson had small, fresh abrasions on: the bridge of her nose; the right side of her jaw; the right side of her neck; the side of her mouth; her hip area and on her upper thighs (Tr. 339-41, 346, 352-54, 412-14).  Nelson also had a fingernail injury to her shoulder, near her neck, which is often a mark of manual strangulation (Tr. 343-44, 417). Nelson had fresh bruises on her right arm near the elbow and fresh bruises and abrasions on her wrists (Tr. 345, 347-48).  The bruises on Nelson's wrists were consistent with a man grabbing her forcefully by her wrists and holding her down with his hands (Tr. 348, 352).  Nelson's wrist injuries were not consistent with being bound and did not have traces of a sticky adhesive residue (Tr. 348-51, 411).  All of the external

10

injuries were fresh or recently inflicted (Tr. 338-45, 354-55).  Dr. Mont testified that the injuries to her neck were consistent with an individual strangling Nelson using two hands or using one, large hand (Tr. 367-75, 403-05, 408).  Dr. Mont testified that the injuries to the other parts of the body beyond the neck had nothing to do with the strangulation and were consistent with the body being dragged after death or something else (Tr. 421).

An anal and vaginal examination was also performed on Nelson (Tr. 355-56).  Dr. Mont also testified that he examined Nelson's anus and that he found a possible abrasion just at the orifice of her anus, and that she also had a few small tears at the mouth of the cervix and at a slightly larger tear to the front part of the anterior portion of the cervix (Tr. 365).

### 4. The Defense Case

Petitioner did not call any witnesses or introduce any exhibits.

### 5. Closing Arguments

In closing, Petitioner's counsel began with a discussion of the prosecutor's voir dire questions on beating and raping a prostitute and then proceeded to a discussion of the prosecutor's opening statement discussing Petitioner's activities after Petitioner killed Nelson (Tr. 444-45).  Petitioner's counsel stated that there was no evidence in the case of a rape or of a beating (Tr. 445).  Petitioner's counsel also stated that while the prosecutor said in her opening statement that after the crime was committed, Petitioner was partying on South Beach and going to the finest restaurants, no evidence of that was introduced at trial (Tr. 445-46).  Petitioner's counsel also contended that the rape kit should be termed a DNA kit because it did not provide evidence that a rape occurred and also that there was not evidence that a rape occurred in this case (Tr. 447-48).

11

Petitioner's counsel went on to state that there was no evidence that the injuries to Nelson's cervix and anus were recent and the prosecutor had not asked the Medical Examiner if those injuries were recent (Tr. 448). Petitioner's counsel conceded that Petitioner killed Nelson, but argued that the issue before the jury was whether the crime was second degree murder or manslaughter, and that the weight of the evidence did not support second degree murder (Tr. 446, 449-61). Petitioner's counsel then applied the facts in evidence to the elements of second degree murder and manslaughter, focusing on Petitioner's theory that he had strangled Nelson due to the intense pain when she had kicked him between the legs and not out or hatred, ill-will, spite or an evil intent toward Nelson (Tr. 461-71). A repeated theme of Petitioner's closing was that the prosecutor was trying to inflame the jury's emotions and anger the jury by talking about rape and about Petitioner strangling Nelson with two hands around her neck when there was no evidence of either, and by introducing multiple photographs of Nelson's naked corpse.

The prosecutor's closing began with a discussion of second degree murder and manslaughter and the application of the facts to the law (Tr. 472-480). The prosecutor agreed that this was not a rape case and that her voir dire questions about raping and beating a prostitute was to determine how the potential jurors felt about crimes against prostitutes (Tr. 500-01). The prosecutor discussed Petitioner's version of what occurred and how it was inconsistent when compared to the other testimony and evidence, which supported her conclusion that Defendant's statements were self-serving and untrue (Tr. 480-500, 505–06). Specifically, relying on the Medical Examiner's testimony that it would take three to five minutes to strangle someone, the prosecutor said that strangling someone to death is not an accident, it is a purposeful, intentional act (Tr. 485). Similarly, relying on the Medical Examiner's testimony, the prosecutor contended that

the injuries on Nelson's wrists were consistent with being forcibly held down by Petitioner, and not with Nelson being tied up (Tr. 498-99).  Finally, the prosecutor concluded by arguing that the evidence showed that Petitioner strangled Nelson for at least three minutes, which killed her, and that fact indicates hatred, ill-will, spite or evil intent (Tr. 506-08).

In Petitioner's rebuttal closing, Petitioner's attorney reiterated that the jury had to put emotion aside, and accused the prosecutor of appealing to the jury's emotions because the evidence did not support a murder conviction (Tr. 508-09, 513-15, 518-20). Petitioner's attorney then argued again that Petitioner killed Nelson as an instinctive reaction to Nelson kicking Petitioner in the testicles and that this fact supported a manslaughter conviction (Tr. 509-11).  Petitioner's attorney argued that prosecutor misstated in closing the evidence that the wound to Nelson's anus was fresh, and that, in fact, the prosecutor knew that the wounds to the cervix and anus were not fresh (Tr. 512-13).[6]  Petitioner's attorney then argued that Petitioner and Nelson had probably had rough sex, and Petitioner had tied Nelson down, and that prostitutes will do freaky things for more money (Tr. 517).[7]  Petitioner's attorney concluded by arguing that the killing could have occurred the way the prosecutor contended, and the killing could have happened the way Petitioner said in his statement, and if the jury had any doubt that the killing occurred the way that the prosecutor contended, they should find Petitioner guilty of manslaughter (Tr. 520).

---

[6] The prosecutor objected that Petitioner was misstating the evidence, and the Court instructed the jurors to rely on their own recollection of the evidence (Tr. 513).

[7] The prosecutor objected that Petitioner was arguing facts not in evidence.  The Court again told the jurors to rely on their own recollection of the evidence (Tr. 517).

6.  **The Verdict and Sentence**

On October 22, 2004, the jury returned its verdict that Petitioner was guilty of second-degree murder (R. 151-52; Tr. 562-63, 565, 583).  The trial court then sentenced Petitioner to life imprisonment (R. 160; Tr. 583-84).

B.  **Petitioner's Appeal**

Petitioner then appealed his conviction, arguing that the cumulative effect of repeated prosecutorial misconduct had denied him a fundamentally fair trial, in violation of the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution (Ex. A to DE # 14).  The State filed an Answer brief (Ex. B to DE # 14), and Petitioner filed a Reply Brief (Ex. C to DE # 14).  On November 2, 2005, the state appellate court affirmed Petitioner's conviction and sentence without any written opinion, which foreclosed any further review in the state court system.  *Tejera v. State*, 919 So.2d 455 (Fla. 3d Dist. Ct. App. 2006).  On November 18, 2005, Petitioner filed a motion for rehearing (Ex. D).  On January 6, 2006, the state appellate court denied Petitioner's motion for rehearing (Ex. G.).  On January 30, 2006, the state appellate court issued its mandate (Ex. F).  Petitioner did not seek certiorari review from the United States Supreme Court and the deadline for Petitioner to do so was April 6, 2006, 90 days after the state appellate court denied Petitioner's motion for rehearing.

C.  **The Instant Petition**

On January 29, 2007, Petitioner, through his counsel, attorney Lawrence Besser, timely filed a petition under 28 U.S.C. § 2254 for writ of habeas corpus by a person in state custody.  In the petition he raised only the issue that he was denied a fair trial in violation of the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution due to repeated prosecutorial misconduct at every stage of

14

the trial from voir dire, through opening statement, during the case-in-chief, and in closing argument (DE ## 1, 2).

On July 10, 2007, Respondent filed its Answer to the petition (DE # 10).

On December 7, 2007, the undersigned ordered Petitioner, by December 20, 2007, to file a reply in support of the petition which 1) discussed the standard of review laid out in 28 U.S.C. 2254(d)(1), 2) stated how the state court ruling in this case was contrary to or unreasonably applied clearly established Supreme Court precedent and 3) specifically stated the United States Supreme Court precedent which the state court ruling was contrary to or which the state court unreasonably applied (DE # 18).[8]

On December 12, 2007, attorney Besser filed a response to the Court's December 7, 2007 Order and to Petitioner's December 3, 2007 letter in which he asked to be allowed to withdraw as Petitioner's counsel, and that Petitioner be allowed a sufficient amount of time to file the ordered reply in support of the Petition (DE ## 18, 19).  On December 14, 2007, the undersigned granted attorney Besser's motion to withdraw, and stated that Petitioner could file a reply in support of the Petition by January 4, 2008 (DE # 21).

On March 19, 2008, Petitioner, pro se, timely filed a reply in support of the Petition (DE # 29).

**II.  The Legal Standards Governing Habeas Corpus Proceedings Under 28 U.S.C. § 2254**

The resolution of this case is governed by the standards promulgated by Congress in the Antiterrorism and Effective Death Penalty Act ("AEDPA") enacted on

---

[8] Also on December 7, 2007, Petitioner filed a Motion to Hold Court's Ruling In Abeyance Thus Allowing Petitioner To Exhaust Several Constitutional Issues At State Level (DE # 17).  The undersigned has entered an order denying the motion.

April 24, 1996, and codified in Title 28, United States Code, Section 2254(d).[9]  That statute

governs both the determination of whether to grant an evidentiary hearing and the

standard of review of the state court's determination of the issues presented.  It

provides, in pertinent part:

> An application for a writ of habeas corpus . . . shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State Court . . . unless adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or an
> unreasonable application of, clearly established federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the state court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court has established that this statute altered the

previous scope of review of state court decisions.  *Schriro v. Landrigan*, 127 S. Ct. 1933,

1939-40 (2007); *Williams v. Taylor*, 529 U.S. 362 (2000).  As explained by the Court in

*Williams*, prior to this amendment, "a federal court should grant a state prisoner's

petition for habeas relief if that court were to conclude in its independent judgment that

the relevant state court had erred on a question of constitutional law or on a mixed

constitutional question."  529 U.S. at 402.  Under the AEDPA, however, a federal court

can grant the writ only if the state court decision was either "contrary to" or an

"unreasonable application of" clearly established Supreme Court precedent.

The Supreme Court has explained the meaning of the AEDPA amendments as

follows:

---

[9]  As stated in Respondent's Memorandum, it is clear that this Petition was timely
filed (DE # 14 at 15-16).

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-13.

The Eleventh Circuit has reiterated this standard, holding that a decision is "contrary to" clearly established federal law "if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case."  *Rutherford v. Crosby*, 385 F.3d 1300, 1306 (11th Cir. 2004) (citing *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)).  "The Supreme Court has held that § 2254(d)(1) imposes a highly deferential standard for evaluating state-court rulings, a standard which demands that state-court decisions be given the benefit of the doubt.  More than once the Supreme Court has instructed lower federal courts that the statute requires more than mere error, and more even than clear error, before federal habeas relief may be issued."  *Id.* (internal citations omitted). Finally, it is the habeas petitioner who carries the burden of establishing his right to

relief.  *See Romaine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001).

With respect to the second basis for relief under AEDPA–an "unreasonable determination of the facts in light of the evidence presented in the state court proceedings"– the Supreme Court has rejected such claims where there is evidence in the record that supports the state court's determination of the facts.  *Schriro*, at 1940-42; *Rice v. Collins*, 546 U.S. 333, 338-42 (2006).  If "[t]he parties do not dispute the underlying facts, ... respondent is ... entitled to habeas relief *only* if he can meet one of the two bases for relief provided in § 2254(d)(1)."  *Price v. Vincent*, 538 U.S. 634, 639-40 (2003).

The state appellate court's summary affirmance of Petitioner's conviction constitutes an adjudication on the merits and, thus, is entitled to deference under § 2254(d)(1) in this proceeding.  *See Price v. McDonough*, Case No. 07-21469-ASG, 2008 WL 2594985 at *5 n.7 (S.D. Fla. Jan. 23, 2008), citing *Wright v. Sec'y for Dept. of Corrections*, 278 F.3d 1245, 1254 (11th Cir. 2002).

Factual findings by state courts are presumed to be correct in federal *habeas corpus* proceedings.  The circumstances under which an evidentiary hearing can be granted are governed by 28 U.S.C. § 2254(e).  Under subsection (e)(1), the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  Under subsection (e)(2), if the factual record has not been developed in state court proceedings, the court is nevertheless precluded from holding an evidentiary hearing unless the claim relies on (i) a new rule of constitutional law; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would

have found the petitioner guilty of the underlying offense.

III.  Analysis

A.  Introduction

Petitioner has filed a petition for *habeas corpus* in this Court pursuant to 28 U.S.C. § 2254, based on his allegation that, due to the prosecutor's misconduct at trial, he was denied due process and a fundamentally fair trial, pursuant to the Fifth and Fourteenth Amendments.  In sum, Petitioner contends that the prosecutor inflamed the jury through the following improper actions:  1) interjecting into the trial the issue of whether Petitioner had sexually assaulted his victim, Jennifer Nelson, before strangling her; 2) stating in her opening statement that Petitioner had dined in fancy restaurants after killing Nelson; 3) introducing into evidence multiple photographs of Nelson's naked corpse; 4) repeatedly referring to the rape kit performed on Nelson; 5) providing the jury with a transcript of Petitioner's tape-recorded statements that misstated an important portion of Petitioner's statement, and 6) in closing argument, misstating the evidence and expressing her personal beliefs. that his Fifth Amendment rights had been violated by the state trial proceedings for two reasons.  Since there is no challenge to the underlying facts which form the basis for his claims, Petitioner, in order to obtain relief, must establish that the decisions of the state courts were contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The undersigned finds that 1) there was no prosecutorial misconduct at Petitioner's trial; 2) at worst, any prosecutorial misconduct was *de minimis*; 3) there was overwhelming evidence of Petitioner's guilt; and 4) the state court ruling were not contrary to, or an unreasonable application of, clearly established federal law.

19

B.  <u>No Evidentiary Hearing Has Been Requested Or Is Necessary</u>

Petitioner has not requested an evidentiary hearing regarding his claim.  An

evidentiary hearing is not permitted or warranted under the circumstances of this case.

There has been no challenge to the underlying facts presented at the trial.  The basis of

Petitioner's argument is simply that due to the prosecutor's misconduct at trial, he was

denied due process and a fundamentally fair trial, pursuant to the Fifth and Fourteenth

Amendments.

C.  <u>The Prosecutor's Conduct At Trial Was Not Improper and, In Any Event,
Any Error Was Minimal and Harmless, In Light of the Overwhelming
Evidence of Petitioner's Guilt</u>

1.  <u>Introduction</u>

The undersigned recommends that the petition be denied.  Initially, the

prosecutor's statements at Petitioner's trial were not improper.  Secondly, even if some

of the statements were improper, they did not rise to the level of rendering Petitioner's

trial fundamentally unfair, especially in light of the overwhelming evidence of

Petitioner's guilt.

The clearly established federal law regarding whether to grant a new trial based

improper prosecutorial conduct is found in *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-

48 (1974); *accord Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Pursuant to the

*Donnelly* standard, Petitioner is entitled to relief only if the prosecutor's comments were

so egregious in the context of the entire trial that they rendered his trial fundamentally

unfair.

In the face of the standard imposed by section 2254, Petitioner has not cited any

particular aspect of this case which would indicate that the state courts acted in any way

that was "contrary to" or "an unreasonable application of" a clearly established principle

of federal law in finding that the prosecutor's statements at trial did not render Petitioner's trial fundamentally unfair, except that he disagrees with the result the state courts reached.

Thus, this Court cannot overturn the determinations of the state courts that the prosecutor's statements at trial did not render Petitioner's trial fundamentally unfair.

### 2. The Prosecutor's Statements In Opening Statement and Closing Argument That Petitioner Was Seen Having A Good Time After Nelson's Death Were Proper And Were Supported By The Evidence

Petitioner contends that the prosecutor's opening statement was improper in that the prosecutor stated that Petitioner was seen having a great time after he killed Nelson, and that Petitioner was seen eating on Ocean Drive, on Lincoln Road with a friend, and dining in fancy restaurants.  Petitioner contends that 1) the prosecutor improperly used these statements in her opening to inflame the passions of the jury so that the jury would return an emotional verdict and 2) there was no proper purpose for this statement, which Petitioner contends was not supported by the evidence (DE # 2 at 10-12). Petitioner also contends that the prosecutor's statement in closing argument that Petitioner was seen having a good time after Nelson's death and that this was designed to cover up his criminal conduct and to avoid acting suspiciously was not supported by the evidence and was designed to deceive the jury into convicting Petitioner of murder because he was having a good time (DE # 29 at 11-12).  The undersigned finds that these remarks in prosecutor's opening statement and closing argument were proper, were supported by evidence introduced at trial, and were not attempts to inflame the jury into returning an emotional verdict.

Initially, the prosecutor's arguments were supported by evidence introduced at trial.  At the trial, Officer Marcus Perez testified that he had Petitioner under surveillance

for three days.  On the first day of the surveillance, October 16, 2004, Perez saw

Petitioner enter the News Café on Miami Beach with a white female (Tr. 319).  On

October 18, 2004, the third day of the surveillance, Officer Perez saw Petitioner eat

breakfast with a white female at a restaurant on Lincoln Road (Tr. 326).

Next, the prosecutor used these facts for a proper purpose, to show that

Petitioner was attempting to cover up his criminal conduct by avoiding acting

suspiciously.  The prosecutor did not rely solely on this evidence to support her

argument, but also relied on Petitioner's statements to Firefighter Byrne after Byrne had

knocked on the door to Petitioner's apartment door for five or ten minutes on the night

of the murder regarding the water leak.  Byrne testified that while Petitioner answered

the door and said that he had been sleeping, Byrne had the impression that Petitioner

was not telling the truth and was faking his yawn (Tr. 261-62).  The prosecutor also

mentioned Montenegro's testimony that Petitioner acted furtively when Petitioner

dragged Nelson's body into his car (Tr. 247, 251).  Furthermore, in the pre-interview

statement which Petitioner gave to the police, Petitioner denied having any involvement

in Nelson's homicide, but admitted to picking Nelson up, having sex with her, and then

said he dropped her off a block away from his apartment (Sr. 27-28).

Petitioner has not cited any relevant authority to support his position that it was

improper for the prosecutor to argue from the evidence that Petitioner was trying to hide

the fact that he killed Nelson by acting normally and eating out after the killing, and that

by these actions, he did not show any regret for his actions.

In any event, there is no evidence that the jury could have returned a verdict

based solely on emotion, relying on the prosecutor's argument.  In the trial court's initial

instructions to the jury, the court stated that as to opening statements, what the lawyers

said was not evidence and that the jurors were not to consider it as such (Tr. 201).

Furthermore, while instructing the jurors before deliberations, the court stated, "[t]his case must not be decided for or against anyone because you feel sorry for anyone or are angry at anyone." (T. 529).  The court further instructed the jury,  "Your verdict should not be influenced by feelings of prejudice, bias or sympathy.  Your verdict must be based on the evidence and the law contained in these instructions." (Tr. 530).

Therefore, the prosecutor's statements in opening and in closing argument about Petitioner's actions after the crime were supported by the evidence at trial, and were proper arguments from the evidence concerning Petitioner's efforts to escape being connected to the crime by acting normally.

### 3.  The Prosecutor Did Not Interject The Issue of Rape Into the Case

Petitioner contends that the prosecutor spent the entire case intimating that Petitioner had killed Nelson while raping her, even though there was no evidence of such and Petitioner was not charged with killing Nelson during a sexual assault (DE # 2 at 9, 12-13, 18-20; DE # 29 at 9-11).  However, the undersigned finds that the prosecutor did not argue that Petitioner killed Nelson during a sexual assault.  Moreover, the prosecutor's argument in closing that Petitioner may have killed Nelson during rough sex was supported by the evidence introduced at trial, including Petitioner's own statements to the police.

### 4.  Relevant Excerpts From The Trial

Immediately prior to the opening statements, Petitioner's counsel stated that in voir dire, the prosecutor had stated that the victim had been a prostitute and asked if the prospective jurors thought this fact gave Petitioner license to beat and rape her.  Petitioner's counsel stated that the case did not involve sexual battery, there was no

allegation of sexual battery in the case, and nothing about sexual battery was relevant to the case (Tr. 213).  Petitioner's counsel moved to prevent the state from mentioning in opening argument or during its case-in-chief any evidence relating to any sexual battery that may have been committed (Tr. 214).  The trial judge then asked the prosecutor if she intended to make reference during her opening statement to a sexual battery.  The prosecutor said no.  Petitioner's counsel then stated that there was no problem, and that as long as the state does not intend to mention rape or sexual battery that during its opening, Petitioner was satisfied (Tr. 214).  The prosecutor did not mention rape or sexual battery during her opening statement, and Petitioner did not object to the prosecutor's opening statement.

During the trial, City of Miami Crime Scene Investigator Delancey testified that a rape kit examination had been performed on Nelson.  Delancey stated that taking a rape kit did not mean there was any proof of rape, but was meant to find evidence of sexual intercourse (Tr. 302, 305-06).  City of Miami Detective Orlando Silva subsequently agreed that the purpose of conducting the rape kit examination was to determine if a person has had sex (Sr. 67).  Petitioner's attorney then asked Silva if there was anything from the rape kit performed on Nelson to indicate that there was a rape or any forced sex in this case.  The prosecutor objected that the question would call for the witness to speculate, and the court sustained the objection (Sr. 67).  After Petitioner's attorney tried to ask the same question in another way, the prosecutor again objected, and the objection was sustained (Sr. 67-68).  In his closing argument, Petitioner's counsel contended that the rape kit should be termed a DNA kit because it did not provide evidence that a rape occurred and there was no evidence that a rape had occurred in this case (Tr. 447-48)

During her examination of the Medical Examiner, the prosecutor asked the

Medical Examiner why it is difficult to tell whether a person has had consensual sex or has been raped (Tr. 356). Petitioner's counsel objected. At sidebar, Petitioner's counsel asked that the jury be instructed to disregard any comments about rape (Tr. 356-57). Petitioner's counsel also moved for a mistrial, contending there was no allegation of rape in the case, in which Petitioner was only charged with death by strangulation (Tr. 357-58). Petitioner's counsel contended that the prosecutor had talked about rape in voir dire, and kept on talking about a rape kit during the trial (Tr. 358). The prosecutor said she intended to ask the Medical Examiner about injuries to Nelson's vagina and anus (Tr. 359). The trial court agreed that discussion regarding sexual battery or rape was merely inflammatory and was not probative. The prosecutor said the State did not believe Petitioner's exculpatory statements. She posited that it was likely that Petitioner was rough with Nelson that night, and Nelson did not like it and may have been screaming, and that's why Petitioner killed her. The prosecutor stated that she was not saying that Petitioner raped Nelson (Tr. 360). The trial court sustained Petitioner's objection, instructed the prosecutor to move on, and denied Petitioner's motion for mistrial (Tr. 360-61). Petitioner's counsel then asked for a curative instruction, and the trial court asked Petitioner's counsel to draft one (Tr. 361). Petitioner's attorney agreed that the prosecutor could talk about rough sex, but not about rape or sexual battery, and could ask the Medical Examiner about tears to Nelson's cervix and anus (Tr. 361-63). The court then instructed the jury, as requested by Petitioner's attorney, "Ladies and gentlemen of the jury, any reference to sexual battery or rape is irrelevant to this case and should be disregarded. And I instruct you to disregard it" (R. 95, Tr. 365).

     5. <u>The Prosecutor's Questions and Remarks in Voir Dire Were Proper</u>

     During voir dire, the prosecutor asked certain of the prospective jurors the

following questions and made the following statements to the jury panel:

> Is the life of a prostitute worth less than the life of a politician or doctor?"
> (Tr. 90).  Is it ok to hit or push around a prostitute who is working (Tr. 90-
> 91).  I ask this because the victim in this case was a young 19 year old
> prostitute (Tr. 91).  Do you think a prostitute can be raped? (Tr. 92-93).  Any
> strong negative feelings about prostitutes? (Tr. 93-94).  If a prostitute gets
> injured, does she have it coming? (Tr. 94-96, 99-108).  One juror thinks that
> a victim who is doing something illegal has a problem, may have
> contributed to her death (Tr. 96-97, 98-99).  The killer should not get a
> break because he killed a prostitute (Tr. 99).

There was nothing improper about these questions and statements.  In asking these questions and making these statements, the prosecutor was seeking to ascertain whether any of the prospective jurors: 1) had any bias or prejudice regarding crimes committed against prostitutes in general; 2) had any bias or prejudice regarding the victim in this case, Jennifer Nelson, who was a prostitute; and 3) whether the prospective jurors could render a verdict based solely on the evidence presented and on the law.  This line of questioning is within the purpose of voir dire.  *See United States v. Vera*, 701 F.2d 1349, 1355-56 (11th Cir. 1983) (affirming district court's finding that voir dire questioning was proper because it sought to determine whether the prospective jurors were willing and able to properly apply the law).  Indeed, during voir dire, defense counsel agreed the prosecutor's line of questioning was designed to make sure that the fact that Nelson was a prostitute would not interfere with the jurors' ability to fairly and dispassionately listen to the evidence, would not enter into the jury's deliberations in any way, and that the jurors would not value Nelson's life less than the life of any other person (Tr. 163-65).

### 6.  The Prosecutor Properly Introduced Photographs of Nelson's Body

Petitioner contends that the prosecutor improperly introduced three photographs of Nelson's naked corpse lying in the street, and that the admission of these

photographs, along with other misconduct of the prosecutor, prejudiced his right to a fair trial (DE # 2 at 11-12). However, these photographs were properly admitted and their admission did not represent prosecutorial misconduct. The prosecution was entitled to admit evidence which showed how Nelson's body looked when it was found, the effort the paramedic had made to attempt to revive her, and the attempt to find the killer's fingerprints on her body. Also, the photographs were not so gruesome as to inflame the jury.

Specifically, at trial, and over Petitioner's relevancy objection, the prosecution introduced a picture of Nelson's naked body lying in the street (Tr. 270-73, State Exhibit 10). City of Miami Paramedic Alfredo Agres testified that he was called to the scene and cut off Nelson's clothing to put "fast patches" on, to try and start Nelson's heart and also to check if Nelson's heart was beating (Tr. 276-78, 279). Again over Petitioner's relevancy objection, the prosecution introduced a second picture of Nelson's naked body lying in the street, with the "fast patches" attached (Tr. 278-79; State Exhibit 11). City of Miami Crime Scene Investigator Delancey processed the crime scene near Jackson Memorial Hospital after 7:00 a.m. Among other actions, he processed Nelson's body for fingerprints, but did not find any (Tr. 284-85, 287-91, 295-97). Again over Petitioner's relevancy objection, the prosecution introduced a third picture of Nelson's naked body lying in the street, which detailed the fingerprinting process (Tr. 291-97, State Exhibit 18).

Petitioner concedes that the introduction of these photographs, by itself, was not unduly prejudicial, but argues that the introduction was part of cumulative errors which prejudiced his right to a fair trial (DE # 2 at 12). Insofar as the undersigned has not found any cumulative errors, it is not necessary to examine this issue in depth.

However, there is no reason to believe, and Petitioner does not even argue, that these photographs were so gruesome as to inflame the jury.  Moreover, the prosecution was entitled to admit evidence showing how Nelson's body looked when it was found, what effort the paramedic made to attempt to revive her, and the attempt to find the killer's fingerprints on her body.

7.  <u>The Prosecutor's References To The Rape Kit Were Proper</u>

Petitioner argues that the used of the term "rape kit" at trial was improper (DE # 2 at 11-12).  However, the prosecutor properly referred to the fact that a rape kit was performed on Nelson's corpse.  It was made clear to the jury that the use of the term "rape kit" did not mean that a rape occurred in this case, and that neither party was contending that Petitioner raped Nelson.  Furthermore, the discussion of the rape kit was proper because it was a necessary part of the case and the use of the rape kit was inextricably intertwined with and necessary to complete the story of the murder.

Initially, the term "rape kit" is a term of art as used by medical and law enforcement personnel.  It does not necessarily insinuate that a rape actually occurred, and on two occasions Petitioner's attorney explained this fact to the jury (Tr. 305-06, 447-48).  Indeed, the court instructed the jury, as requested by Petitioner's attorney, "Ladies and gentlemen of the jury, any reference to sexual battery or rape is irrelevant to this case and should be disregarded.  And I instruct you to disregard it" (R. 95, Tr. 365).  The jury is presumed to follow the court's instructions.  *See United States v. Brown*, 983 F.2d 201, 203 (11th Cir. 1993); *accord Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  Finally, the prosecutor also told the jury during her closing that this was not a case about rape (Tr. 500).

Moreover, the discussion of the rape kit was a necessary part of the case was

inextricably intertwined with the story of the murder and the facts of the case. Petitioner's DNA was obtained from Nelson's corpse through the use of a rape kit, and thus, it was necessary to inform the jury how Petitioner's DNA had been obtained from Nelson's corpse, and then was matched to Petitioner's DNA obtained from his discarded cigarette.  *See United States v. Lindsey*, 482 F.3d 1285, 1294 (11th Cir.) (evidence of a plan to rob a bank was inextricably intertwined with the charged possession of the firearm and was necessary to complete the story of the crime), *cert. denied*, 128 S.Ct. 438 (2007); *accord United States v. Cox*, 188 Fed. Appx. 889, 893-94 (11th Cir. 2006) (where the defendant was charged with illegal possession of a firearm, evidence of the defendant's uncharged drug sales in his house was relevant intrinsic evidence from which the jury could infer that he knowingly possessed the firearm he hid in his parents' house).

### 8. The Error In The Transcript of Petitioner's Statement, Which Was Prepared By the Prosecution, Did Not Render Petitioner's Trial Fundamentally Unfair

Petitioner contends that the prosecution deliberately made an error in the transcript of Petitioner's statement to the police to hurt his defense (DE # 2 at 14-15). However, the error in the transcript of Petitioner's statement, which stated "she kicked into my legs very hard", instead of "she kicked me right in between the legs very hard" (Sr. 39), did not render Petitioner's trial fundamentally unfair.  The court instructed the jury that the tape, not the transcript controlled, and the jury was informed numerous times of the error in the transcript, and of what Petitioner had actually stated.

Indeed, Petitioner's counsel did not object to the admission of the transcript of Petitioner's statements as State's Exhibit 27 (Sr. 30).  Moreover, before the tape was played, Petitioner's counsel asked for an instruction that the tape was evidence, not the

transcript, the transcript was an aid, and the tape controlled (Sr. 31-32).  The Court instructed the jury that the transcripts had been prepared as a convenience, and that if there were any discrepancies between the tape and the transcript, what they heard on the tape was the evidence (Sr. 32-33).  Petitioner's counsel and the prosecutor both stated that they were satisfied with the instruction (Sr. 33).

The prosecution then played the tape (Sr. 31-62).  During cross-examination of Detective Silva, the court instructed the jury again that the tape spoke for itself (Sr. 73-74).  Petitioner was allowed to replay the portion of the tape which stated "she kicked me right in between the legs very hard"(Sr. 77-80).  In response to Petitioner's questions, Silva pointed out two other typographical errors on the transcript (Sr. 81-82).  The Court noted that Petitioner's attorney had not objected to admitting the transcript (Sr. 83). Detective Silva testified that Petitioner stated that Nelson had kicked him between the legs, and not into the legs (Sr. 39, 78-79).

In light of the evidence that the jury was made aware on numerous occasions that the tape, not the transcript, controlled, and that the jury was fully aware Petitioner had actually said that Nelson kicked him right between the legs very hard, there is no support for Petitioner's petition that the mistake in the transcript denied him a fundamentally fair trial.

### 9.  The Prosecutor's Closing Argument Was Proper

Petitioner contends that in closing argument, the prosecutor improperly placed her personal opinion and emotion in front of the jury in an effort to convince them that Petitioner had killed Nelson while raping her (DE # 2 at 18-20; DE # 29 at 13).  The undersigned finds that the prosecutor's closing argument was proper.  The prosecutor did not improperly interject her personal beliefs into the closing argument, but merely

argued inferences from the evidence.  The prosecutor also did not misstate the evidence in her closing argument.  In any event, the court frequently instructed the jurors that their recollection of the evidence controlled.

### a. Relevant Excerpts of the Prosecutor's Closing Argument

In her closing argument, the prosecutor referred to Petitioner's statement that Nelson asked him to use tape, and not a shirt or boxers, to bind her wrists during sex (Tr. 494-96).  The prosecutor doubted that Nelson was going to say, "tie me down" to Petitioner, someone she hardly knew, and stated that she thought that was a lie (Tr. 496). At sidebar, Petitioner's counsel asked for a curative instruction and a mistrial alleging that the prosecutor was arguing her personal belief to the jury (Tr. 496-97).  The court sustained the objection.  The prosecutor stated that she was saying that the evidence suggests everything that she is saying is her opinion (Tr. 497).  The court said that while the statement was not a personal expression of the prosecutor's own beliefs, it may have just been improper wording and that the prosecutor had to rephrase her argument. The court sustained the objection, and denied the motion for a curative instruction and the motion for a mistrial (Tr. 498).

The prosecutor then stated,

But I think what likely fits the facts is that they were likely having rough sex (emphasis added).  I never said that this was rape or anything like that. The questions in voir dire were just about getting your feelings about prostitutes, can they be raped or beaten.  Do they have the same rights as everyone else.  What I think was likely to happen was the following (emphasis added).  They were probably like in the bedroom.  He was probably having rough sex with her.  She's got tears to the anus.  She's got tears on the vagina.  And he was holding her down, forcefully, like this, the medical examiner said it.  And the evidence from the jury to her wrists, he said in her statement, they were having sex from behind, he was like hurting her.  It was probably hurting her.  So, she was screaming.  He says in his statement that she's screaming.  And so there are neighbors around him.  It's a small condolence (sic) in an effort to shut her up.  He started

getting rough with her.

(Tr. 500-01).

Petitioner's attorney objected and, at sidebar, moved to strike (Tr. 501).  When the court asked what remark Petitioner's attorney objected to, Petitioner's attorney said the whole line of remarks, which speculates on what happened, the misstatement of the testimony that there were neighbors and that Nelson was probably screaming. Petitioner's attorney argued that none of these facts were in evidence.  The court stated that the jurors would be relying on their own independent recollection of the evidence. The court also noted that: 1) there was testimony that neighbors lived in the building, and that the police, during their investigation, obtained 18 drivers license photographs of the building's inhabitants and 2) Petitioner said in his statement that Nelson either screamed, yelled or raised her voice at the point in time when he grabbed her wrist and she was reaching for the door, so that the prosecutor's argument that Nelson was screaming during sex might be a reasonable inference from the evidence (Tr. 501-02). The court overruled Petitioner's objection and stated that he was going to allow the prosecutor's argument (Tr. 502-03).

The prosecutor then continued, "Like I was saying, I think you can probably infer from the fact what was likely happening, he was holding her down, forcefully and he was, by the injuries that were on her wrists, she has trauma to her cervix.  She has trauma to her anus.  She's got trauma to the wrists.  It's fresh.  That what the doctors say." (Tr. 503).

At sidebar, Petitioner objected to the prosecutor's statement that the injury to the anus was fresh (Tr. 503).  The prosecutor complained that the frequent objections by Petitioner's counsel would not allow her to get through her closing (Tr. 504).  Petitioner's

attorney agreed with the court that the objection was facts not in evidence.  The court overruled the objection, stating that the jury would be instructed to rely on their own independent recollection of the evidence (Tr. 504).

Furthermore, while instructing the jury before deliberations, the Court stated "[t]he case must not be decided for or against anyone because you feel sorry for anyone or are angry at anyone" (Tr. 529), and also instructed the jury, "Your verdict should not be influenced by feelings of prejudice, bias or sympathy.  Your verdict must be based on the evidence and the law contained in these instructions." (Tr. 530).

b.  <u>The Prosecutor Did Not Misstate The Evidence In Her Closing Argument</u>

Contrary to Petitioner's contention, the prosecutor did not misstate the evidence in her closing argument.  Moreover, the trial court instructed the jurors to rely upon their recollection of the evidence.  Therefore, there was no possibility that any misstatements of the evidence which the prosecutor made in her closing resulted in a fundamentally unfair trial.

Initially, Petitioner objected at trial to the prosecutor's argument that Petitioner may have strangled Nelson because she was screaming and that Petitioner was worried his neighbors would hear.  The trial court found that there was evidence that neighbors lived in Petitioner's apartment building and also that Nelson was probably screaming. The record supports the trial court's finding.  In Petitioner's second statement, he had said that Nelson was screaming or talking loudly that she had already told him that she wanted to go home, and that Petitioner was "pissing her off" (Sr. 60-61).  Detective Silva also testified that there were eighteen apartments in Petitioner's building, and that he obtained drivers license photographs of everyone who lived in Petitioner's building (Sr. 16).

Also during her closing, the prosecutor said that "[Nelson] has trauma to her cervix. She has trauma to her anus. She's got trauma to the wrist. It's fresh. That what the doctors says (sic)." (Tr. 503). This is an accurate statement of the evidence. The medical examiner testified that the trauma to Nelson's wrists was fresh (Tr. 345, 347-48). The medical examiner did not testify that the trauma to Nelson's anus and cervix was fresh (T. 365). However, the prosecutor did not argue that the trauma to Nelson's anus and cervix was fresh, just the trauma to the wrists. The statement "it's fresh", comes immediately after the statement that Nelson had trauma to her wrists. The prosecutor did not say "they're fresh", which would have referred to all three traumas.

In any event, any reference to fresh trauma of the cervix and anus would not have made the trial fundamentally unfair, but were reasonable inferences from the evidence. In Petitioner's statement, he stated that he had consensual anal and vaginal sex with Nelson (Sr. 39-40). Petitioner also said in his second statement that he had had "freaky sex" with Nelson while her wrists were bound (Sr. 59, 60-62, 64). These actions could have caused fresh trauma to the anus and cervix. Indeed, during a sidebar discussion, Petitioner's attorney agreed that the prosecutor could talk about rough sex, but not about rape or sexual battery, and could ask the Medical Examiner about tears to Nelson's cervix and anus (Tr. 361-63). Moreover, in Petitioner's rebuttal closing, Petitioner's attorney argued that Petitioner and Nelson probably had had rough sex, that Petitioner had tied Nelson down, and that prostitutes will do freaky things for more money (Tr. 517)

Furthermore, numerous times during the closing arguments in response to objections from both parties of misstatements of the evidence, the court instructed the jurors to rely on their own recollection of the evidence (Tr. 488, 513, 517).

34

Therefore, the prosecutor did not misstate the evidence in her closing argument, and any possible error was cured by the court's frequent instructions to the jury that they must rely on their own recollection of the evidence.

### c.  Any Error in the Prosecutor's Use of the Term "I Think" in her Closing Argument Was Cured by the Court's Instructions and Did Not Render Petitioner's Trial Fundamentally Unfair

Again, contrary to Petitioner's contention, the prosecutor did not interject her own beliefs into her closing argument.  She merely argued her interpretation of the evidence at trial.  In any event, the court had instructed the jury that the lawyer's comments were not evidence and that they must decide the case only upon the evidence they had heard and seen, and from the jury instructions.

In her closing argument, the prosecutor referred to Petitioner's statement that Nelson asked him to use tape to bind her wrists during sex, and not a shirt or boxers (Tr. 494-96).  The prosecutor doubted that Nelson was going to say, "tie me down" to Petitioner, someone Nelson hardly knew, and the prosecutor stated that she thought that was a lie (Tr. 496).  At sidebar, Petitioner's counsel asked for a curative instruction and a mistrial alleging that the prosecutor was arguing her personal belief to the jury (Tr. 496-97).  The court sustained the objection.  The prosecutor stated that she was saying that the evidence suggests everything that she is saying is her opinion, and that she would take it back and would move on (Tr. 497).  The court said that while the prosecutor's statement was not a personal expression of the prosecutor's own beliefs, it may have been improper wording and that the prosecutor should rephrase her argument.  The court sustained the objection, and denied both the motion for a curative instruction and the motion for a mistrial (Tr. 498).

It is clear both from the prosecutor's statements, her explanation of her statement

and from the trial court's ruling, that the prosecutor was not acting improperly, but was commenting on the evidence. *See United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978) (in closing argument, counsel may state his or her contention as to the conclusion which the jury should draw from the evidence).

Initially, the prosecutor's statement was a reasonable inference from the evidence presented at trial. Petitioner gave three statements to the police. In the first two statements, he denied making the marks found on Nelson's wrists (Sr. 27-28, 53). However, in his third statement, Petitioner stated that when Nelson slipped from his grasp when he was trying to take her to the car, he had grabbed her wrists (Sr. 59). Petitioner also said that during sex, Nelson wanted to do "freaky stuff", and she had asked him to tie her wrists together, so he used painting blue tape to bind her wrists and took the tape off her after they finished having sex (Sr. 59, 60-62, 64). The medical examiner testified that Nelson's wrist injuries were not consistent with being bound and did not have traces of a sticky adhesive residue (Tr. 348-51, 411). Therefore, the prosecutor's statement was a reasonable inference from the evidence.

The court also instructed the jury what the lawyers said was not evidence and the jury was not to consider it as such (Tr. 201). The trial court also instructed the jurors that the case must be decided only upon the evidence that they had heard and seen, from the testimony of the witnesses, the exhibits in evidence, and from the jury instructions (Tr. 529).

Petitioner also objects to the other remarks which the prosecutor made during her closing argument which were prefaced by "I think". Petitioner objected to these remarks at trial as not being supported by the evidence. The undersigned has previously found that these arguments were supported by the evidence. Moreover, as

above the prosecutor was arguing reasonable inferences from the evidence, though perhaps inartfully, and was not testifying. Therefore, there is no support for Petitioner's argument that the prosecutor's statements in closing argument denied him a fair trial.

      10. <u>There Was Overwhelming Evidence of Petitioner's Guilt</u>

      In any event, any minimal error by the prosecutor was harmless due to the overwhelming evidence of Petitioner's guilt. Petitioner admitted killing Nelson by strangling her by accident. However, the Medical Examiner testified that it would take three to five minutes of pressure from Petitioner to strangle Nelson to death. Petitioner's three statements to the police were self-serving, internally contradictory and were also contradicted by external evidence.

      Initially, in his pre-interview, Petitioner told the police that he did not have any involvement in Nelson's homicide, but admitted to picking her up, having sex with her, and then dropping her off a block away from his apartment.

      Then, after being confronted with the DNA evidence and the eyewitness testimony, Petitioner gave two tape-recorded statements to Detective Silva. In the first statement, Petitioner said that he had picked up Nelson, a prostitute, and that at his apartment, he and Nelson had engaged in consensual oral, anal and vaginal sex for about forty-five minutes. After they were finished, Petitioner asked Nelson to stay for more money. When Nelson stated that she wanted to go, Petitioner grabbed Nelson's hand, and again asked her to stay, and she "flipped" and kicked him very hard between his legs. Petitioner further stated that Nelson punched him in his face and the side of his head, and when she came toward him again, he grabbed her by the neck with his right hand and she passed out. Petitioner claimed that Nelson's heart was beating softly. Petitioner thinking Nelson was still alive, carried her into his car and decided to leave

Nelson on the street near the emergency room, of Jackson Memorial Hospital, where he thought she would be found.  He said that when he laid her down, face up, she made a noise).  Petitioner stated that he left Nelson there with her shoes and her purse, and then returned home.  Petitioner denied making the marks on Nelson's wrists.

In Petitioner's second statement, he stated that when Nelson slipped from his grasp when he was trying to take her to the car, he had grabbed her wrists.  Petitioner also said that during sex, Nelson wanted to do "freaky stuff", and she had asked him to tie her wrists together, so he used painting blue tape to bind her wrists and took the tape off her after they finished having sex.

The overwhelming evidence at trial contradicted Petitioner's self-serving statements and contradictory statements.  The Medical Examiner testified that it would have taken three to five minutes of pressure from Petitioner to strangle Nelson to death.  The Medical Examiner also testified that Nelson's wrist injuries were not consistent with being bound and did not have traces of a sticky adhesive residue.  Montenegro testified that when Petitioner dragged Nelson to the car, he was furtive and looked like he did not care about Nelson.  Firefighter Byrne testified that when he knocked at Petitioner's door to check on the water leak, Petitioner said he had been sleeping, and faked a yawn, but Byrne did not believe him.

### 11.  Petitioner Has Not Shown That The State Court Proceedings Were Contrary To Established Federal Law

Petitioner contends that the State court proceedings were contrary to established Federal law as stated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *Hill v. Turpin*, 135 F.3d 1411 (11th Cir. 1998) and *Cargill v. Turpin*, 120 F.3d 1366 (11th Cir. 1997) (DE # 2 at 21; DE # 29 at 8-9, 14).  The

undersigned has already found that there was no prosecutorial misconduct at trial, and that any minimal error that did occur was cured by the trial court's instructions and was harmless due to the overwhelming evidence of Petitioner's guilt.  Moreover, as the cases relied upon by Petitioner are factually distinguishable from the instant case, they are not applicable to the State court proceedings, and Petitioner has not shown that the State court proceedings were contrary to established Federal law.

In *Brecht v. Abramson*, 507 U.S. 619, 622-23, 638 (1993), the United States Supreme Court found that in determining whether habeas corpus relief of the petitioner's conviction for murder should be granted based on the prosecution's use of the petitioner's post-Miranda silence for impeachment purposes, the standard of review is whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  Applying that standard, the Supreme Court found that, under the facts of the case, the state's improper use of the petitioner's post-Miranda silence to impeach the petitioner's claim that the shooting was accidental did not have a substantial and injurious effect or influence in determining the jury's verdict.  *Id.* at 639.

Petitioner's reliance on *Brecht v. Abrahamson* is misplaced.  First, the habeas corpus petition was denied in *Brecht* even though the prosecutor's comments were found to have been improper, while here, the undersigned has found that the prosecutor's conduct was not improper.  Moreover, in *Brecht*, the Supreme Court found that the prosecutor's improper comments did not have a substantial and injurious effect or influence in determining the jury's verdict.  Similarly, here, any minimal error made by the prosecutor did not have a substantial and injurious effect or influence in determining the jury's verdict.

In *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), the United States Supreme

Court found that at a murder trial, where the prosecutor made an ambiguous and improper remark in closing argument which arguably referred to codefendant's mid-trial guilty plea to second degree murder, and where the prosecutor's remark was followed by the trial court's specific disapproving instructions to the jury, the petitioner had not shown prejudice amounting to a denial of due process.

Specifically, during the course of a joint first-degree murder trial, the petitioner's codefendant pleaded guilty to second degree murder mid-trial, and the court advised the jury that codefendant had pleaded guilty, and the petitioner's trial would continue. 416 U.S. at 639-40. In the prosecutor's closing, he stated "[the petitioner and his counsel] said they hope you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first degree murder". *Id.* at 640. The petitioner's counsel objected and sought a curative instruction, and the court gave a specific instruction, including a statement that the jury was to disregard the prosecutor's statement and that the jury was to consider the case as though no such statement had been made. *Id.* at 640-41. The Supreme Court, relying in large part on the trial court's curative instruction, denied habeas corpus relief to the petitioner, finding that a few arguably improper sentences in the prosecutor's closing had not denied due process to the petitioner. *Id.* at 644-48.[10]

Again, Petitioner misplaces his reliance on *Donnelly v. DeChristoforo,* in which the Supreme Court found that minor prosecutorial error had not denied the petitioner due process. Here, too, any prosecutorial misconduct was minor, the trial court gave

---

[10] The Supreme Court also rejected the First Circuit's finding that the prosecutor's statement necessarily implied that the petitioner had offered to plead guilty, but that the prosecutor had refused the offer. *Id.* at 641-42.

adequate curative instructions, and Petitioner has not shown that he was denied due process.

Petitioner also relies on two cases decided by the United States Court of Appeals for the Eleventh Circuit.  Since only decisions of the United States Supreme Court are considered when determining whether the state courts' decision is contrary to or an unreasonable application of federal constitutional law, these decisions are not determinative.  However, a review of these cases reflects that the state courts' decision in the case at bar is not inconsistent with either of the Eleventh Circuit cases cited by Petitioner.

In *Hill v. Turpin*, 135 F.3d 1411, 1413-16 (11th Cir. 1998), the United States Court of Appeals for the Eleventh Circuit initially found that the prosecutor had repeatedly violated the petitioner's due process right when he made several assertions in the state's case-in-chief, during cross-examination of the petitioner and in closing argument pertaining to the petitioner's post-*Miranda* request for counsel and assertion of his right to silence.  The Eleventh Circuit also found that the trial court's attempted curative instructions had aggravated the prejudice to the petitioner.  *Id*. at 1419.  The Eleventh Circuit then found that the prosecutor's repeated improper references to the petitioner's post-*Miranda* request for counsel and assertion of his right to silence, when combined with the significant weaknesses in the state's case against the petitioner, did not constitute harmless error under the *Brecht v. Abrahamson* standard.  *Id*. at 1416-19.

*Hill v. Turpin* is factually distinguishable from the instant case.   Here, any prosecutorial misconduct was minor, the trial court gave adequate curative instructions, there was overwhelming evidence of Petitioner's guilt, and Petitioner has not shown that he was denied due process.  In *Hill*, the Eleventh Circuit found that the prosecutor had

repeatedly violated the trial court's rulings not to mention the petitioner's post-*Miranda* request for counsel and assertion of his right to silence, and this fact, when combined with trial court's inadequate curative instructions and the significant weaknesses in the state's case against the petitioner, led to a finding that the errors had affected the jury's verdict.   Therefore, *Hill* is inapplicable to the instant case.

In *Cargill v. Turpin*, 120 F.3d 1366, 1376-85 (11th Cir. 1997), the United States Court of Appeals for the Eleventh Circuit, in affirming the denial of the petition for habeas corpus for a murder conviction resulting in the death penalty, found, *inter alia*, that improper prosecutorial comments made during the petitioner's sentencing hearing did not deprive the petitioner of a fair sentencing hearing.  Specifically, the prosecutor, during his opening statement at the sentencing hearing, made comments regarding an unrelated crime unsupported by any evidence at trial and also referred to two pieces of hearsay evidence which had never been introduced at trial and probably could not have been admitted.  *Id.* at 1379-80.  The Eleventh Circuit found these comments were not prejudicial because they were not objected to and because both counsel and the court told the jury that opening and closing remarks did not constitute evidence.  *Id.* at 1380-81.[11]

Petitioner has also not shown how *Cargill v. Turpin* demonstrates that the State court proceedings in this case violated established federal law.  In *Cargill,* the Eleventh Circuit affirmed the district court's denial of habeas corpus, finding, *inter alia*, that improper prosecutorial comments made during the petitioner's sentencing hearing did

---

[11] The Eleventh Circuit also rejected the petitioner's arguments that other statements made by the prosecutor during closing argument were improper and found that any improper statements were harmless.  120 F.3d at 1381-85.

not deprive the petitioner of a fair sentencing hearing because they were insufficiently prejudicial, under the facts of that case,  Here, as in *Cargill,* the prosecutorial misconduct, if any, was minor, the trial court gave adequate curative instructions, and Petitioner has not shown that he was denied due process at his trial.

Therefore, the undersigned finds that as Petitioner has not met his burden of demonstrating that Petitioner's state court proceedings were contrary to established Federal law, the petition should be denied.

IV.  <u>Conclusion</u>

Petitioner has not demonstrated a basis upon which this Court may grant *habeas* relief.  The record is devoid of any indication that the state court proceedings engendered a result that was contrary to established federal precedent, either by misapplying a standard of law as enunciated by the United States Supreme Court or by coming to a conclusion that conflicted with a Supreme Court case decided on materially identical facts.  Nor is there any indication that the state court unreasonably applied a principle of law established in Supreme Court precedent to the facts of Petitioner's case. In any event, any error was harmless due to the overwhelming evidence of Petitioner's guilt.

Accordingly, for the reasons stated herein, it is hereby **RECOMMENDED** that David Tejera's Petition Under 28 U.S.C. Section 2254 for a Writ of Habeas Corpus (DE #1), be **DENIED**.

The parties will have ten days from the date of service of this Order to file written objections, if any, for consideration by the Honorable Federico A. Moreno, Chief United States District Judge.  Failure to file objections timely shall bar the parties from

attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d

745 (11th Cir. 1988), *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993)

**DONE AND SUBMITTED** in Miami, Florida, on September 12, 2008.

_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

**Copies furnished to:**
**The Honorable Federico A. Moreno**
   **Chief United States District Judge**
**All counsel of record and Petitioner, pro se**

44